## NUNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DONALD W. HICKS, SR.,**

      **Plaintiff,**

                                  **Civil Action 2:09-cv-01001**
**vs.**                                  **Judge Peter C. Economus**
                                  **Magistrate Judge E.A. Preston Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff, Donald W. Hicks, Sr., filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental social security income.  Plaintiff filed his current application on May 7, 2003, alleging that he became disabled on December 27, 1990, as a result of depression, anxiety, back pain, and chronic bronchitis.[1]  (R. at 301–02, 324.)

After initial administrative denials of his claim, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on January 17, 2006.  In a decision dated September 13, 2006, ALJ Thaddeus J. Armstrong, Sr. found that Plaintiff was not disabled.  That decision became the final decision of the Commissioner when the Appeals Council denied

---

[1] Plaintiff also filed several earlier applications for supplemental social security income. (R. at 18, 62–63, 195–96, 202–04.)  His September 1, 1998 application led to an October 26, 2000 Administrative Law Judge ("ALJ") decision finding that he was not disabled.  (*See* R. at 272–94.)  In the September 2006 decision, ALJ Armstrong chose to re-evaluate Plaintiff's residual functional capacity due to the presence of new and material evidence.  (R. at 18.)

review on September 22, 2009.

Plaintiff thereafter timely commenced this civil action.  In his Statement of Errors, Plaintiff contends that in light of the opinions of his treating physicians, substantial evidence does not support the ALJ's decision.  Plaintiff also maintains that the ALJ failed to properly consider the combined impact of his mental and physical impairments.  The Commissioner responded, opposing remand or reversal, and the matter is now ripe for decision.  For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II. Plaintiff's Application and Testimony

Plaintiff was fifty-one years old at the time of the January 2006 administrative hearing. He reported an eleventh grade education and has relevant past work as a janitorial supervisor. (R. at 816, 859.)  In his May 7, 2003 Application for Supplemental Social Security Income, Plaintiff stated that he had been disabled since December 27, 1990.  (R. at 301.)  Within his Disability Report, which Plaintiff also completed in May 2003, Plaintiff indicated that he stopped working, and became unable to work, in June 1998.  (R. at 324.)

At the administrative hearing, Plaintiff testified that he had been shot in the back in 1979 and that event had resulted in back complications.  (R. at 818.)  Plaintiff testified that he chose December 27, 1990 as his disability date because he had lost his job,[2] and he felt he could not perform any other jobs.  (*Id.*)  Plaintiff stated that he had not worked since December 1990, but later indicated that he had been mistaken and his last day of work was January 1, 1991.  (R. at 819–20.)  Plaintiff admitted that he had been convicted of receiving stolen property in 2001.[3]  (R.

---

[2]  Plaintiff's custodial employer had lost its contract.  (R. at 818.)

[3]  Plaintiff also reported serving prison time in 1978.  (R. at 816.)

at 816–17.)

Plaintiff testified that he could no longer work because of pain in his hand and back, as well as his problems with depression.  (R. at 821.)   Plaintiff noted that he had a right hand injury, which he inflicted upon himself following a fight with his girlfriend.  (*Id.*)  The injury had occurred approximately twelve years before the 2006 administrative hearing.  (*Id.*)  According to Plaintiff, he is unable to lift objects with his injured hand.  (R. at 822–23.)  Plaintiff testified that he had received therapy treatment for his hand, but seemed uncertain about when he had stopped this treatment.[4]  (R. at 823.)

Plaintiff stated that he experiences significant back pain.  (R. at 824.)  Plaintiff testified that he wears a back brace and that his back pain confines him to one room of his house.  (*Id.*)  Plaintiff indicated that the pain from his back shoots down into both of his legs.  (*Id.*)  He further stated that he had been seeing doctors for his back pain approximately once a month for at least eight years.  (R. at 825.)  Plaintiff also noted that medication was the only form of treatment he was receiving for his back pain.  (R. at 828.)

Plaintiff also answered questions about his depression, and other conditions, at the administrative hearing.  Plaintiff testified that he has attempted to kill himself, has suicidal thoughts, and crying spells.  (R. at 818, 830–33.)  He reported trouble sleeping both on and off medication.  (R. at 833.)   Plaintiff noted that he regularly attends appointments with his therapist and doctor for treatment of his depression.  (R. at 829–30.)  Finally, Plaintiff noted breathing problems, uses a breathing treatment machine, and is anemic. (R. at 834.)

---

[4]  Plaintiff specifically testified that the last time he had therapy was "[i]n 2000, no it was 1980, 1995, yeah."  (R. at 823.)

As to his daily activities, Plaintiff testified that he lives alone.  (R. at 850.)  According to Plaintiff, he does not clean his house, do any dishes, or visit friends and relatives, and he only cooks microwavable foods.  (R. at 850–51.)  Plaintiff did report that he was able to drive, use public transportation, and attend church on Sundays.  (R. at 816, 836, 855.)  Plaintiff testified that he does not exercise and uses a cane if he has to stand up or walk for over a fifteen-minute period.  (R. at 852.)  He stated on a typical day he just lays around in bed.  (R. at 853.)  Plaintiff estimated that he could walk, stand, or sit for only five to ten minutes at a time.  (R. at 854.)  He stated that he could not lift over five pounds.  (*Id.*)

### III.  The Medical Records

A.  Mental Impairment

    1. Dr. Wright

Plaintiff began mental health treatment in March 2000.[5]  (R. at 658.)  On April 24, 2000, psychiatrist Francis Wright, M.D., examined Plaintiff.  (R. at 656–57.)  Plaintiff apparently reported to Dr. Wright that he was a high school graduate with one year of college education, and that he had worked as a maintenance man as recently as 1999.  (R. at 656.)  At the time of the examination, Plaintiff reported that he was nervous and suffering from insomnia.  (*Id.*)  Dr. Wright found that Plaintiff was pleasant and cooperative, not suicidal, and had no looseness in thinking.  (R. at 657.)  He diagnosed Plaintiff with depressive disorder and prescribed Plaintiff Zoloft and Valium.  (*Id.*)

Plaintiff continued to see Dr. Wright,  from April 2000 until at least April 2001.  (R. at

---

[5]  The record reflects that Plaintiff also received some outpatient mental health treatment from Eastway in 1996–97.

4

648–57.)  In July 2000, Plaintiff reported that he was feeling significantly better on his medications and felt in good spirits.  (R. at 655.)  He discussed beginning a home exercise program.  (*Id.*)  Dr. Wright remarked that Plaintiff was not overtly depressed and "would pass for normal in most situations" in October 2000.  (R. at 654.)  On January 16, 2001, Plaintiff reported that his life was quite stable.  (R. at 653.)  Dr. Wright noted that Plaintiff's goal was to become an accountant.  (*Id.*)  In April 2001, Plaintiff was in good spirits, but was having trouble getting his fourteen year old son to attend school.  (R. at 652.)  Plaintiff did, however, report nervousness and anxiety during his examinations with treating physician Scott Shaw, M.D., during this period.  (*See, e.g.*, R. at 478–79.)

While treating Plaintiff, Dr. Wright assessed Plaintiff's work ability on multiple occasions.  On April 24, 2000, Dr. Wright opined that Plaintiff was unemployable.  (R. at 645.)  In June 2000, Dr. Wright filled out a questionnaire regarding Plaintiff's work-related functioning.  (R. at 143–47.)  Dr. Wright concluded that Plaintiff was incapable of performing a number of work related categories.  (R. at 144–46.)  These categories included being prompt and regularly attending work; responding appropriately to supervisors; withstanding pressures of normal work productivity; sustaining attention and concentration; behaving in an emotionally normal matter; and performing work activities within a schedule.  (*Id.*)  Dr. Wright noted that Plaintiff was under stress from attempting to raise his children and was irritable because of his insomnia.  (R. at 146.)  In a June 2001 letter, Dr. Wright reported that although Plaintiff was doing quite well on his medication, it was doubtful Plaintiff would be able to hold down a job.  (R. at 648.)

2. Dr. Gollamudi

Plaintiff began treatment with Advanced Therapeutic Services on April 9, 2003. (R. at 641–43.) Upon initial assessment, Plaintiff reported anxiety and anger, but denied suicidal ideation. (*Id.*) Plaintiff began treating with psychiatrist Dr. A. Gollamudi on April 10, 2003. (R. at 638–40.) Plaintiff presented with anxiety and depression. (*Id.*) Dr. Gollamudi initially diagnosed Plaintiff with adjustment and anxiety disorder. (*Id.*) Dr. Gollamudi assigned a global assessment of functioning ("GAF") of 55,[6] and continued Plaintiff on Zoloft and Valium. (*Id.*)

Plaintiff continued treatment with Dr. Gollamudi until at least November 2005. (*See* R. at 610–37.) In April 2003, Plaintiff ran out of medication, and due to depression and recently family deaths, attempted to burn his house down. (R. at 638.) Later in April 2003, however, Plaintiff reported that he was feeling better on medication and was not experiencing side effects. (R. at 637.) In May 2003, Dr. Gollamudi diagnosed Plaintiff with anxiety disorder with mixed emotional feelings. (R. at 636.) On September 30, 2003, Plaintiff reported to Dr. Gollamudi that his anxiety was under control with medication. (R. at 632.) During September 2004, Plaintiff stated that he was in pain due to work he had done at home, but continued to report he was stable

---

[6] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009). Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. "[A] GAF score between 41 and 50 reflects '*serious symptoms such as suicidal thoughts, severe obsessive rituals, or other serious impairments in social, occupational or school functioning.*'" *Id.* (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed.1994)) (emphasis added). "A GAF score of 51-60 'indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.* few friends, conflict with peers or co-workers).'" *Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 177 n.1 (6th Cir. 2009) (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006)).

on medication.  (R. at 623.)  Although Plaintiff reported some behavioral problems with his son and daughter, Dr. Gollamudi's late 2004 and 2005 findings were similar to his earlier treatment notes.  (R. at 610–22.)   Within his mental status examination notes assessing Plaintiff, Dr. Gollamudi consistently reported normal findings, including a lack of suicidal ideation.  (R. at 610–37.)  Furthermore, Plaintiff frequently indicated that he was doing well on medication, and Dr. Gollamudi also noted that Plaintiff was stable on his medication.  (*Id.*)  On June 6, 2005, however, Plaintiff did indicate some problems with his medications.  (R. at 615.)

On November 1, 2005, Dr. Gollamudi completed a questionnaire regarding Plaintiff's work abilities.  (R. at 606–09.)  Dr. Gollamudi concluded that Plaintiff had moderately severe or severe impairments in all of the work related categories listed in the questionnaire.  (R. at 606–08.)  These categories included following instructions; independently performing routine repetitive tasks; sustaining attention; responding to time limits; relating to supervisors and co-workers; and tolerating the stress of a work environment.  (R. at 607–08.)  Dr. Gollamudi diagnosed Plaintiff with posttraumatic stress disorder, bereavement, and polysubstance dependence in remission.  (R. at 608.)  Dr. Gollamudi opined that Plaintiff's condition was fair, but that his physical health and life stressors exacerbated his emotional condition.  (*Id.*)  Furthermore, Dr. Gollamudi commented that Plaintiff had been unable to work for at least three years due to physical injuries and emotional problems, but opined that with optimal progress Plaintiff might be able to work in a year.  (R. at 609.)

3. Good Samaritan Hospital

Plaintiff was admitted to Good Samaritan Hospital on April 25, 2004 and was discharged on April 27, 2004.  (R. at 709–18.)  Plaintiff reported that he was afraid he might do something

7

he would regret because of his financial distress.  (R. at 710.)  Plaintiff reported one suicide attempt in 1996 when he had attempted to cut off his hand. (R. at 713.)  Although Plaintiff exhibited poor psychomotor activity, he was later observed playing pool in the recreation room. (R. at 714.)  Later on in his hospitalization, Plaintiff was once again observed in the recreation room demonstrating euthymic affect with full range.  (*Id.*)  Plaintiff denied suicidal ideation or hallucinations.  (R. at 715.)  Upon notice of discharge, Plaintiff threatened to commit a crime. (R. at 716.)  Dr. Suzie Nelson of Good Samaritan Hospital opined that Plaintiff's threat was not the product of mental illness.  (*Id.*)

    4.  <u>State Agency Evaluations</u>

As a result of Plaintiff's applications for supplemental social security income, a number of state agency physicians have examined and reviewed Plaintiff's mental impairments. Psychologist Mary Ann Jones, Ph.D., evaluated Plaintiff on October 20, 1998.  (R. at 87–90.) Plaintiff reported to Dr. Jones that he had graduated from high school in 1972 and had last worked in 1997 as an assembly worker.  (R. at 87.)  Dr. Jones noted that Plaintiff appeared dysphoric, but opined that Plaintiff was "semi-dependent to reasonably autonomous."  (R. at 88–89.)  After an examination of Plaintiff, Dr. Jones diagnosed Plaintiff with pain disorder with psychological and medical features, and assigned Plaintiff a GAF of 52.  (R. at 89.)  Dr. Jones concluded that Plaintiff would be capable of following simple one to two step tasks, but that his psychological symptoms would interfere with his abilities.  (R. at 90.)  Dr. Jones found that Plaintiff's ability to sustain concentration and attention for normal employment was fair, but that his ability to interact with others was questionable.  (*Id.*)  Finally, Dr. Jones found that his ability to tolerate stress was fair to impaired.  (*Id.*)

Guy Melvin, Ph.D. evaluated the record evidence and assessed Plaintiff's mental ability on November 18, 1998.  (R. at 99–107.)  Dr. Melvin concluded that Plaintiff had slight restrictions in activities of daily living, moderate difficulties in maintaining social functioning, often had deficiencies in concentration, and had one or two episodes of decompensation.  (R. at 106.)

Dr. Jones completed a second examination of Plaintiff on August 15, 2003.  Dr. Jones evaluated Plaintiff's level of functioning as reasonably autonomous, but noted that Plaintiff was dysphoric and did not appear to be invested in portions of the examination.  (R. at 405–06.)  Dr. Jones diagnosed Plaintiff pain disorder, major depression, and generalized anxiety disorder.  (R. at 407.)  She assigned Plaintiff a GAF of 50.  (*Id.*)  Dr. Jones found that Plaintiff's ability to relate to others; ability to understand and follow directions; and ability to withstand the pressures of daily work were all impaired.  (R. at 407–08.)  Dr. Jones concluded that Plaintiff's ability to concentrate and perform simple repetitive tasks was moderately impaired.  (R. at 407.)  According to Dr. Jones, Plaintiff had no problems with attention or concentration during the interview, but was minimally invested.  (R. at 408.)

On September 20, 2003, Kristen E. Haskins, Psy.D., reviewed the evidence regarding Plaintiff's mental impairments.  (R. at 423–36.)  Dr. Haskins concluded that Plaintiff's impairments were not severe.  (R. at 423.)  Based on her review of the evidence, Dr. Haskins concluded that Plaintiff had mild restrictions of daily living, mild difficulties in social functioning, mild difficulties in concentration, and no episodes of decompensation.  (R. at 433.)  Dr. Haskins found that a variety of factors called Plaintiff's credibility into question including that his treatment records showed "only a very few brief notations about depression and anxiety

and nothing to indicate severe and/or an increase in symptoms." (R. at 435.) Dr. Haskins also opined that through his repeated disability filings Plaintiff may have become "savvy" in his approach to answering questions. (*Id.*)

John R. Williams, Ph.D., reviewed Plaintiff's record on March 12, 2004. (R. at 519–34.) Dr. Williams found that Plaintiff had moderate restrictions on daily living; moderate difficulties in social functioning; and moderate difficulties maintaining concentration, persistence, or pace. (R. at 529.) Additionally, Dr. Williams evaluated Plaintiff's mental residual functional capacity ("RFC") and found that Plaintiff was generally not significantly limited in or only moderately limited in most areas of memory, concentration, social interaction, and adaption. (R. at 532–33.) The only area where Dr. Williams found Plaintiff to be markedly limited was in his interaction with the general public. (R. at 533.) Dr. Williams did note that his mental RFC was an adoption of the ALJ's RFC within the prior October 2000 decision. (R. at 534.)

B. Physical Impairment

1. Physical  Treatment Notes[7]

Plaintiff also alleges disability due to his physical impairments, including back pain and pain in his right hand. Plaintiff's back pain stems from a gun shot wound he suffered in 1979 and a self-inflicted hand wound which occurred in 1994. (R. at 256, 816.) Scott Shaw, M.D., and the Shear Family Practice Network began treating Plaintiff as early as September 2000. (*See* R. at 494–95.) Plaintiff underwent a CT scan of the lumbar spine in November 2000. (R. at

---

[7] Plaintiff does not specifically challenge any conclusion the ALJ reached with regards to Plaintiff's physical functioning. Nevertheless, Plaintiff does generally maintain that the ALJ failed to consider Plaintiff's mental and physical impairments in combination. (Statement of Errors 17–20, ECF No. 9.)

385.)  Although the test revealed a bullet fragment at the T12-L1 level, the reviewing doctor

noted no significant pathology.  (*Id.*)  Specifically, there was no evidence of disc herniation, no

spinal stenosis, and the facet joints and vertebral body height were well maintained.  (*Id.*)

Plaintiff was prescribed both medication and physical therapy.  (*See, e.g.*, R. at 445–98, 745–47.)

Plaintiff visited the emergency room for chronic back pain several times in 2003.  (R. at

386–91, 401–01B, 417–22.)  In April 2003, testing revealed no pulmonary infiltration or plueral

effusion, as well as no acute pathology.  (R. at 387.)  An examination of Plaintiff in September

2003 did reveal decreased range of motion, tenderness, and spasms in Plaintiff's back.  (R. at

422.)  A September 12, 2003, x-ray of Plaintiff's lumbar spine demonstrated a bullet fragment

near the transverse process at L1, but provided no evidence of acute disease.  (R. at 549.)

In April 2005, Plaintiff received further testing at the Good Samaritan Hospital.  (R. at

794.)  Study of the test results demonstrated "no fracture, subluxation, prevertabral soft tissue

swelling or abnormality in spinal alignment."  (*Id.*)  The results revealed diffuse anterior

osteophytic change throughout the mid cervical region as well as posterior osteophytes at the C4-

C5 levels.  Nevertheless, there was "[n]o radiographic evidence of spinal instability" and neural

foramina was widely patent.  (*Id.*)

Dr. Shaw continued treating Plaintiff for back pain until at least 2005.  (*See* R. at

445–512, 535–47, 748–98.)  In his treatment of Plaintiff's back pain, Dr. Shaw frequently noted

tenderness and muscle spasms.  (*See, e.g.*, 453, 467, 480, 767, 778.)  From 2000 to 2005,

Plaintiff also received treatment for other impairments including hypertension and bronchitis.

(*See, e.g.*, R. at 459, 758.)  In his treatment notes, Dr. Shaw also observed that Plaintiff used a

cane for support.  (*See, e.g.*, R. at 752.)  Plaintiff complained of wrist pain, and Dr. Shaw did at

11

times note a decreased range of motion in Plaintiff's right wrist.  (*See* R. at 457, 488, 494, 737.)
Furthermore, the treatment notes indicate that Plaintiff wore a wrist brace.  (R. at 737.)

2.  Dr. Shaw's Evaluations

Dr. Shaw completed a basic medical form on January 21, 2003.  (R. at 646–47.)  In the
form, Dr. Shaw described Plaintiff's medical conditions as low back pain, anxiety, hypertension,
asthma, and reactive airway disease.  (R. at 646.)  Dr. Shaw concluded that Plaintiff could walk,
stand, or sit two hours in an eight hour work day, but only one hour uninterrupted.  (R. at 647.)
According to Dr. Shaw, Plaintiff could lift only six to ten pounds, whether lifting was frequent or
occasional.  (*Id.*)  Dr. Shaw opined that Plaintiff was unemployable.  (*Id.*)  Dr. Shaw filled out
another basic medical form on October 28, 2004, in which he reached substantially similar
conclusions.  (R. at 539–40.)

3.  State Agency Evaluations

 Multiple state agency physicians have reviewed Plaintiff's physical impairments.  Ray
Guy, M.D., examined Plaintiff on November 6, 1998.  (R. at 91–98.)  Plaintiff reported
intermittent wrist pain and constant back pain.  (R. at 91.)  Upon examination, Dr. Ray noted that
Plaintiff was able to ambulate short distances without difficulty.  (R. at 92.)  Dr. Ray found that
there was some tenderness in Plaintiff's back.  (*Id.*)  Ultimately, Dr. Ray concluded that Plaintiff
would be able to sit without difficulty; stand for two hours at a time; ambulate for 30 minutes at
a time; carry 20 pounds occasionally; and 10 pounds frequently.  (R. at 93.)  Dr. Ray noted that
Plaintiff would be able to hold only light objects with his right hand and was not able to
forcefully grip with his right hand.  (R. at 93.)

On December 7, 1998, Robert A. Weisenburger, M.D., reviewed Plaintiff's medical

12

records.  (R. at 111–19.)  Dr. Weisenburger concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently.  (R. at 113.)  Dr. Weisenburger opined that Plaintiff could sit, stand, and walk for a total of about six hours in an eight hour workday.  (*Id.*)

Dr. Damian Danopulos examined Plaintiff on August 6, 2003.  (R. at 393–401.)  At the examination Plaintiff reported last working in 1998.  (R. at 393.)  Plaintiff complained of back pain radiating to both legs, hypertension, wrist pain, and depression.  (*Id.*)  Plaintiff's upper and lower extremities revealed a full range of motion.  (R. at 395.)  Dr. Danopulos observed that Plaintiff had a normal gait without ambulatory aids.  (R. at 396.)  Although Plaintiff's LS spine motions were restricted and painful, Dr. Danopulos found no evidence of nerve root compression or peripheral neuropathy.  (*Id.*)  Dr. Danopulos noted that Plaintiff "was trying to show that he was very depressed."  (R. at 397.)  After examining Plaintiff, Dr. Danopulos concluded that Plaintiff had lumbo/sacral arthrosis that was aggravated by his depression, well controlled hypertension, diminished gripping strength in the right wrist, and depression.  (*Id.*)  Dr. Danopulos opined that Plaintiff's back pain and right hand weakness restricted certain work related activities such as handling objects, walking, lifting, and carrying.  (*Id.*)

In August 2003, Arthur L. Sagone, M.D., reviewed Plaintiff's medical records.  (R. at 409–16.)  Similar to Dr. Weisenburger, Dr. Sagone concluded that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, and could stand, walk, and sit for approximately six hours in a workday.  (R. at 410.)  Dr. Sagone based his conclusions in part on the results of the November 2000 X-ray.  (R. at 411.)

C.  Vocational Evaluation

Plaintiff completed a two week vocational evaluation at Goodwill Industries of Miami

13

Valley from June to July of 2001.  (R. at 662–706.)  Plaintiff's discharge report noted that he had

behaved inappropriately at times during the evaluation process.  (R. at 669.)  For example,

Plaintiff was observed spontaneously dancing down the hallways while he walked through the

facility.  (*Id.*)  The vocational rehabilitation employees suspected that Plaintiff may have been

using an illegal substance.  (R. at 674.)  Plaintiff also had attendance and punctuality problems

during the evaluation process.  (R. at 669.)  The discharge report further noted that Plaintiff

appeared able to perform mail sorting, assembly, and sorting occupations, but that employment

would not be feasible until Plaintiff was able to improve attendance, punctuality, and

interpersonal interaction.  (R. at 674.)  Ultimately, Plaintiff's report recommended that he attend

a work training program, which would assist him in being able to obtain and maintain

employment.  (R. at 676.)

### IV.  Expert Testimony

A.  Medical Expert

Mary Eileen Beuvine, M.D., testified as a medical expert at the January 2006 hearing.

(R. at 837–49.)  Dr. Beuvine indicated that the record evidence supported diagnosis of an anxiety

disorder.  (R. at 837.)  Dr. Beuvine went on to summarize the record.  (R. at 837–43.)  She

concluded that Plaintiff did not meet a listing requirement, but that he did struggle with

depression.  (R. at 844–45.)  As to Plaintiff's mental work abilities, Dr. Beuvine stated that he

should be limited to simple tasks with no production quotas.  (R. at 846.)  Furthermore, Dr.

Beuvine determined that Plaintiff should have very limited contact with supervisors and co-

workers, and no contact with the public.  (R. at 846.)

During her testimony, Dr. Beuvine discussed the evaluations and treatment notes of Dr.

14

Gollamudi. Specifically, Dr. Beuvine noted that the diagnoses within Dr. Gollamudi's

November 2005 evaluation, as well as the severity of the evaluations, were not consistent with

his treatment notes. (R. at 842, 844.) Furthermore, she found from Dr. Gollamudi's evaluations

that it appeared that Plaintiff had become worse with treatment, but that this was not indicated in

his treatment notes. (R. at 846.) In attempting to reconcile Dr. Gollamudi's evaluation and

treatment notes, Dr. Beuvine recognized that Dr. Gollamudi was factoring in the pain from

Plaintiff's physical conditions. (R. at 844.) She opined that "maybe he felt that [Plaintiff's

physical condition] contributed to the limitations." (*Id.*) Nevertheless, Dr. Beuvine also stated,

"[i]t's difficult for me to come to terms with what the actual treating notes say and how his

psychiatrist evaluated him." (*Id.*)

## B. Vocational Expert

Charlotta Ewers testified as a vocational expert at Plaintiff's administrative hearing. (R.

at 856–868.) Ms. Ewers classified Plaintiff's past work as a janitorial supervisor, which she

found to be within the light category and semi-skilled. (R. at 859.) The ALJ then described a

hypothetical person within the light work range who could do nothing more than simple

repetitive tasks; needed ten to fifteen minutes to sit or stand each hour, in addition to normal

breaks; was limited to only occasional contact with co-workers and supervisors and no contact

with the public; who could not have production quotas; and who had limited dexterity in his or

her dominant hand.[8] (R. at 860–62.) Ms. Ewers described that such a person could not do

Plaintiff's past relevant work but that such a person could be a mail clerk, warehouse checker, or

---

[8] The ALJ also indicated other restraints on categories such as bending and foot controls,
but these limitations did not change Ms. Ewers' conclusions (R. at 862–63.)

15

copy machine operator. (*Id.*) Ms. Ewers concluded that the only sedentary work such a person

could do would be surveillance system monitor. (R. at 862.) In response to the questioning of

Plaintiff's attorney, Ms. Ewers concluded that the ALJ's hypothetical person would be incapable

of work if he or she could not use his or her dominant hand at all. (R. at 864.) Ms. Ewers also

determined that jobs would not exist if such a person could not be punctual or have good

attendance. (R. at 865.)

## V.  The Administrative Decision

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security

Act in his September 13, 2006 decision. After performing a review of the mental and physical

medical evidence, the ALJ went through the five step sequential evaluation process.[9] At the first

step of the sequential evaluation process, the ALJ found that Plaintiff and has not engaged in

substantial gainful activity after his May 7, 2003 application. (R. at 32.)

---

[9] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. See 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Next, the ALJ found that Plaintiff has the severe impairments of lumbosacral arthrosis with associated pain; limited use of his right hand due to a knife wound; residual effects of a bullet wound with the bullet lodged near the spine; hypertension; anemia; and affective disorder with anxiety.  (*Id.*)  At step three, the ALJ then determined that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 33.)

At step four of the sequential process, the ALJ evaluated Plaintiff's RFC. The ALJ concluded that Plaintiff had the ability to perform a reduced range of light work.  (R. at 34.)  The ALJ assigned the following limitations to Plaintiff's ability to perform light work:

> [N]o more than simple repetitive tasks; the opportunity to sit or stand an added ten-to-fifteen minutes per hour in addition to normal breaks at his convenience and need not be consecutively; no use of foot pedals, leg controls or similar controls involving the lower extremities; may use a cane for ambulation and/or standing; occasional contact with co-workers and supervisors, but not in isolation; no contact with the general public as a work requirement; no production quotas, such as piecemeal work; only occasional bending forward normally but can frequently bend forward to 45 degree angle by locking the spine by slight backwards extension and then bend forward 45 degrees using the hips, and if needed, using the knee to assist; no fine manipulation or strenuous gripping with the right hand but can hold objects such as a pen or pencil; no dexterity such as keyboarding or typing.

(R. at 34.)

In reaching his RFC determination, the ALJ recognized that there were widely divergent opinions from the medical sources who had assessed Plaintiff's impairments.  (R. at 34.)  These opinions ranged from opinions finding Plaintiff completely disabled to opinions finding that Plaintiff had no severe mental impairments and a capacity for medium range work.  (R. at 34.)  The ALJ rejected the opinions of treating physicians Drs. Shaw, Wright, and Gollamundi.  (R. at 29–32, 34.)  The ALJ found that these treating physicians' opinions were inconsistent with other

17

substantial evidence in the record and were also unsupported by medically acceptable clinical and laboratory diagnostic techniques.  (R. at 31.)  Instead, the ALJ credited the opinions of Drs. Ray, Danopulos, Jones, and Buban as accurate compromises between the varying opinions in the record.  (R. at 34.)  Additionally, the ALJ found that Plaintiff's subjective complaints were not entirely credible, pointing to various inconsistencies between Plaintiff's testimony regarding the extent of his limitations and other portions of the record.  (R. at 36–37.)

Based on the above RFC, and the vocational experts's testimony, the ALJ found that Plaintiff could not perform his past relevant work.  (R. at 37.)  Nevertheless, applying the Medical Vocational Guidelines as a frame of reference, and relying on the testimony of Ms. Ewers, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy.  (R. at 38–39.)  Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act and denied his application for supplemental social secuirty income.  (R. at 39.)

## VI.  Standard of Review

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.  Legal Analysis

Plaintiff sets forth two issues in his Statement of Errors.  First, Plaintiff maintains that the ALJ's decision is not supported by substantial evidence in light of the opinions of Plaintiff's treating physicians. (Statement Errors 12–17, ECF No. 9.)  Specifically, Plaintiff contends that the ALJ was not justified in rejecting the opinions of Dr. Gollamudi, which indicated that Plaintiff was incapable of work.  (*Id.*)  Second, Plaintiff contends that the ALJ failed to consider the combination of Plaintiff's physical and mental impairments in considering Plaintiff work related ability.  (*Id.* at 17–20.)

A.  Treating Physician Opinions

    1.  Applicable Law

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case.  20 C.F.R. § 404.1527(d).  Certain types of opinions, however, are normally

entitled to greater weight.  20 C.F.R. § 404.1527(d).  For example, the ALJ generally gives

deference to the opinions of a treating source "since these are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [a patient's] medical

impairment(s) and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone . . ." 20 C.F.R. § 404.1527(d)(2); *Blakley*,

581 F.3d at 408.

If the treating physician's opinion is "well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in

[the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. §

404.1527(d)(2).  The United States Court of Appeals for the Sixth Circuit has noted:

> On the other hand, a Social Security Ruling explains that "[i]t is an error to give
> an opinion controlling weight simply because it is the opinion of a treating source
> if it is not well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or if it is inconsistent the with other substantial evidence in
> the case record." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). If
> the ALJ does not accord controlling weight to a treating physician, the ALJ must
> still determine how much weight is appropriate by considering a number of
> factors, including the length of the treatment relationship and the frequency of
> examination, the nature and extent of the treatment relationship, supportability of
> the opinion, consistency of the opinion with the record as a whole, and any
> specialization of the treating physician. *Wilson*, 378 F.3d at 544; *see also* 20
> C.F.R. § 404.1527(d)(2).

*Blakley*, 581 F.3d at 406.  Furthermore, an ALJ must "always give good reasons in [the ALJ's]

notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating

source's opinion." 20 C.F.R. § 404.1527(d)(2).

Along similar lines, the opinions of treating and examining sources are generally entitled to more weight than opinions of consulting and non-examining sources.  20 C.F.R. § 404.1527(d); *see also West v. Comm'r Soc. Sec. Admin.*, 240 Fed. Appx. 692, 696 (6th Cir. 2007) (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981)) ("[R]eports from treating physicians generally are given more weight than reports from consulting physicians . . . .").  Nevertheless, an ALJ need not credit a treating physician opinion that is unsupported.  *See Anderson v. Comm'r Soc. Sec.*, 195 Fed. Appx. 366, 370 (6th Cir. 2006) ("The ALJ concluded, properly in our view, that the [treating physician's]  treatment notes did not support and were inconsistent with his conclusory assertion that appellant was disabled."); *see also Kidd v. Comm'r of Soc. Sec.*, 283 Fed. Appx. 336, 340 (6th Cir. 2008) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir.1994)) ("The [Commissioner], however, is not bound by treating physicians' opinions, especially when there is substantial medical evidence to the contrary. . . .  Such opinions are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence.").

Finally, the Commissioner reserves the power to decide certain issues, such as whether a claimant is ultimately disabled.  20 C.F.R. § 404.1527(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

2.  <u>Analysis</u>

In this case, three physicians who routinely treated Plaintiff gave opinions and

evaluations regarding the severity of Plaintiff's impairments.  All of these physicians ultimately opined that Plaintiff was disabled or unemployable.  After a review of the record and the ALJ's decision, however, the undersigned finds that the ALJ did not err in assigning Plaintiff's RFC and rejecting the treating physician opinions of Drs. Gollamudi, Wright, and Shaw.[10]  Several reasons support this conclusion.

First, the ALJ did not commit any procedural error in applying the treating physician rule.  The ALJ performed a comprehensive review of Plaintiff's physical and mental impairments, summarizing the opinions, findings, and treatment notes of the medical sources. (R. at 20–28.)  The ALJ then gave a synopsis of the relevant treating physician law, including the relevant factors he must consider in assessing opinion weight, and provided a three page explanation of why he rejected the opinions of Drs. Gollamudi, Wright, and Shaw.  (R. at 29–32.)  Within his reasoning, the ALJ explained that it appeared that the treating physicians relied too heavily on Plaintiff's subjective complaints, which the ALJ ultimately found to be not entirely credible.  (R. at 29, 35–37.)  The ALJ summarized how Plaintiff's objective physical evidence did not show the level of severity consistent with Dr. Shaw's opinion.  (R. at 29.)  The ALJ then explained how the findings of the state agency physicians also conflicted with Dr. Shaw's opinion.  (R. at 29–30.)

With regards to Plaintiff's mental impairments, the ALJ summarized Plaintiff's treatment notes and indicated that Plaintiff's condition has responded to treatment.  (R. at 30.)  The ALJ also emphasized that there was a lack of evidence to support the severity of the opinions of Drs.

_____

[10]  Plaintiff focuses his first contention of error on the ALJ's rejection of Dr. Gollamudi's opinion.  (*See* Statement of Errors 12–17, ECF No. 9.)  Nevertheless, in an abundance of caution, the undersigned will consider Plaintiff's rejection of all three treating physicians.

Gollamudi and Wright.  (R. at 31.)  Moreover, the ALJ noted the findings of state agency

physicians, including Dr. Buban, which he found to support a lesser level of impairment severity.

(*See* R. at 30-31.)  Based on these reasons, the ALJ found the relevant treating source opinions

both unsupported and inconsistent with other substantial evidence.  (R. at 31.)  During his RFC

assessment, the ALJ also explained that due to the wide ranging assessments of Plaintiff's

ability, he found the more moderate opinions of Drs. Ray, Danopulos, Jones, and Buban to be a

more accurate reflection of Plaintiff's functional capacity.[11]  (R. at 34.)  Accordingly, based on

the ALJ's thorough explanation, the undersigned finds no basis for finding any procedural error.

Second, substantial evidence supports the ALJ's rejection of the treating physician

opinions.  Based on the record, a reasonable person could certainly find that Dr. Shaw's opinion

regarding Plaintiff's physical limitations is both unsupported and inconsistent with other

substantial evidence.  Although the records do indicate that Plaintiff has an impairment, which

the ALJ found to be severe, nothing in Dr. Shaw's own treatment notes or Plaintiff's test results

indicate that Plaintiff's impairments rise to the level of severity that Dr. Shaw's evaluations

reflect.  Rather, despite Plaintiff's bullet wound, testing results revealed no evidence of spinal

instability; no fracture, subluxation, prevertabral soft tissue swelling or abnormality in spinal

---

[11]  Plaintiff asserts that the ALJ did not actually adopt the opinions of Dr. Jones.
(Statement of Errors 15–16, ECF No. 9.)  Dr. Jones performed two evaluations.  Within her
evaluations, Dr. Jones opined that Plaintiff's mental impairments would interfere with his ability
to follow simple directions and that Plaintiff was "impaired" or "moderately impaired" in certain
work related areas.  (R. at 90, 407–08.)  Nevertheless, Dr. Jones did not give a clear opinion as to
whether these impairments would prohibit work, and also found Plaintiff was "reasonably
autonomous" and appeared not to be invested in his second evaluation.  (*See* R. at 405–08.)  The
ALJ's decision found that Plaintiff has severe mental impairments and incorporated those
impairments into his assigned RFC.  Under these circumstances, the undersigned finds that DR.
Jones opinions and the ALJ's decision are consistent.  Furthermore, the ALJ had various other
reasons, and medical source opinions, supporting a rejection of Plaintiff's treating physicians.

alignment; no evidence of disc herniation, no spinal stenosis; and that the facet joints and vertebral body height were well maintained.  (R. at 385, 794.)  Furthermore, the opinions of the examining and reviewing state agency physicians conflict with the level of severity Dr. Shaw assigned, with two sources indicating Plaintiff was capable of medium work, and one source concluding that Plaintiff could perform light work.

The ALJ's rejection of Drs. Gollamudi and Wright is also supported by substantial evidence.  The treatment notes of these sources provide little, if any, support for the severity of their findings.  Although the treatment notes do support mental impairment, and reflect some adjustments in medication, the notes also paint a picture of a person who was relatively stable on medication and often doing well.  Tellingly, upon her review of Plaintiff's entire mental evidence record, Dr. Buban explicitly stated, "[i]t's difficult for me to come to terms with what the actual treating notes say and how his psychiatrist evaluated him."[12]  (R. at 844.) Accordingly, Dr. Buban found Plaintiff's impairments to be less limiting than Drs. Gollamudi and Wright's evaluations reflect.  (*See* R. at 846.)  Furthermore, the assessments of the state agency physicians, as well as the medical expert, all appear less severe than the opinions of Drs. Gollamudi and Wright, with one physician even concluding that Plaintiff had no severe mental impairments.

Third, the ALJ's credibility finding bolsters his rejection of Plaintiff's treating

---

[12]  Plaintiff emphasizes that Dr. Buban opined that Dr. Gollamudi's evaluation seemed to be a result of consideration of both physical and mental impairments.  (*See* R. at 846.) Nevertheless, taken as a whole, Dr. Buban's testimony still reflects a substantial level of doubt regarding the support for Dr. Gollamudi's opinions. (R. at 842–46.)  Furthermore, Dr. Gollamudi's treatment notes and opinions provide no indication that Dr. Gollamudi was relying on anything other than Plaintiff's subjective complaints in considering the effect of Plaintiff's physical impairments.

physicians.  Plaintiff is correct that, due to the nature of mental impairments, the diagnostic

techniques that physicians in the field use are likely to be less tangible than those in other fields

of medicine.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989).  Nevertheless, this

does not mean that an ALJ is required to accept the mental impairment opinions of a treating

physician who relies solely on a plaintiff's subjective complaints.  *See Ferguson v. Comm'r of

Soc. Sec.*, --- F.3d ----, 2010 WL 5185848, at *2–5 (6th Cir. 2010) (finding that an ALJ

appropriately rejected the opinion of, and did not have to recontact, a treating psychiatrist when

her opinion was based on "[claimant's] self-reported history and subjective complaints [and was]

not supported by objective medical evidence . . ."); *see also* SSR 96-7p, 1996 WL 374186 (July

2, 1996) (describing the process by which the Commissioner evaluates the credibility of a

claimant's "description of his or her physical or mental impairment(s)").

Because of the lack of objective findings supporting the severity of the treating source

opinions, it appears that these sources relied heavily on Plaintiff's subjective complaints.[13]

Nevertheless, as detailed in the ALJ's opinion, there are substantial reasons to doubt Plaintiff's

credibility.  Plaintiff's testimony and the medical records contain a number of potential

inconsistencies in areas such as Plaintiff's work history and the extent of Plaintiff's pain.  For

example, although Plaintiff testified he could sit for no more than five to ten minutes at a time,

the ALJ observed that Plaintiff sat through the administrative hearing without any signs of overt

distress.[14]  (*See* R. at 36, 854.)  Additionally, during his treatment at Good Samaritan Hospital

_____

[13]  Plaintiff has not explicitly challenged the ALJ's credibility finding.

[14]  Based on the length of the transcript the undersigned is confident that the hearing
lasted significantly longer than five to ten minutes.

25

Plaintiff was engaged in recreational behavior that appeared inconsistent with his reported physical and mental symptoms.  (*See* R. at 714.)  During his vocational evaluation, staff members suspected illegal substance use because of Plaintiff's erratic behavior.  (R. at 674.)  Based on this evidence, as well as other evidence in the record, the ALJ was justified in finding that Plaintiff was not entirely credible.  This credibility finding casts further doubt on the opinions of Plaintiff's treating physicians, who were relying on Plaintiff's own accounts and subjective complaints.

Plaintiff's final assertion, within his first contention of error, is that the ALJ improperly relied on his own judgment rather than considering the medical evidence.  (Statement of Errors 16–17, ECF No. 9.)  Plaintiff focuses on the ALJ's finding that "[i]f the degree of limitation described by these treating sources was, in fact, credible, it would be expected that the claimant would be receiving much more comprehensive care and treatment but such was not the case."  (R. at 29.)  From this statement, Plaintiff essentially accuses the ALJ of substituting his own judgment for the treating physicians' judgment without relying on record evidence.  (*See* Statement of Errors 16–17, ECF No. 9.)  The undersigned finds Plaintiff's assertion unavailing.  Particularly, this argument takes the ALJ's statement in isolation and fails to read the ALJ's decision as a whole.  As noted above, the ALJ gave a variety of reasons for rejecting the treating physicians' opinions that came from the record evidence, including inconsistencies between the sources' own treatment notes and their evaluations as well as the opinions of the various state agency physicians.  Accordingly, the notion that the ALJ relied arbitrarily on his own opinion is without merit.

For the above reasons, the undersigned finds that the ALJ's rejection of the treating

26

physician opinions was supported by substantial evidence.  Plaintiff may be correct that a

reasonable person, relying on the treating physician sources, may have concluded that Plaintiff's

impairments were more severe than the ALJ found.  Nevertheless, this is not the standard of the

Court's review.  *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

("The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. . . .  [T]here is a 'zone of choice'

within which the Commissioner can act, without the fear of court interference.") (internal

quotations omitted); *Lander v. Astrue*, No. 1:08-CV-00823, 2010 WL 3655995, at *9 (S.D. Ohio

Apr. 5, 2010) (holding that without a lack of substantial evidence, or other error, "the Court is

not free to re-weigh the medical source opinions or to resolve other evidentiary conflicts").  As

the ALJ noted, there are numerous medical sources who have issued a variety of widely

diverging opinions in this case.  Under these unique circumstances, and factoring in the lack of

support for the treating physician opinions, it was not unreasonable for the ALJ to reject the

extreme opinions on both sides and accept the more moderate medical source opinions.

B.  Assessment of the Combination of Impairments

    1.  Applicable Law

    As noted above, Plaintiff's second contention of error is that the ALJ failed to consider

the combined effects of his physical and mental impairments.  If the Commissioner "find[s] a

medically severe combination of impairments, the combined impact of the impairments will be

considered throughout the disability determination process."  20 C.F.R. §§ 404.1523, 416.923.

"In other words, '[o]nce one severe impairment is found, the combined effect of all impairments

must be considered, even if other impairments would not be severe.'"  *Simpson v. Comm'r of*

*Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (quoting *White v. Comm'r of Soc. Sec.*, 312 F.

App'x 779, 787 (6th Cir. 2009).  Accordingly, once an ALJ finds any severe impairment, he or

she must consider the combined effect of a claimant's impairments in assessing the claimant's

RFC.  *See id.* at 190–91.  Furthermore, it is error for the Commissioner to separate impairments

and decide whether each impairment individually qualifies a claimant for disability.  *Walker v.*

*Sec*'y *of Health and Human Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992) (determining it was an

error for "the ALJ [to] look[] at each impairment in a vacuum and [make] two separate

determination as to whether each one, separately, would qualify [a claimant] for disability").

Finally, it is not enough for an ALJ to simply state that the combined effects of a claimant's

impairments were considered, if, "there was, in reality, no combined treatment in the ALJ's

analysis or elsewhere."  *Blankenship v. Bowen*, 874 F.2d 1116, 1123–24 (6th Cir. 1989).

    2. <u>Analysis</u>

    In this case, Plaintiff sets forth a sentence from the ALJ's decision, which he interprets in

isolation, to maintain that the ALJ failed to consider the combined effects of his impairments.

Specifically, Plaintiff emphasizes that the ALJ rejected Dr. Gollamudi's opinion, in part, because

Dr. Gollamudi "attributed the claimant's inability to work to a combination of physical and

mental impairments exacerbated by life stressors."  (R. at 31; Statement of Errors 17–18, ECF

No. 9.)  Plaintiff interprets this statement to mean that the ALJ considered Plaintiff's

impairments in a vacuum in reaching his disability decision.  (Statement of Errors 18, ECF No.

9.)  Additionally, Plaintiff contends that various medical sources recognized the interplay

between Plaintiff's physical and mental impairments.[15]  (*Id.* at 19.)

The undersigned finds that there is a different, and more likely, interpretation of the ALJ's statement concerning Dr. Gollamudi.  Specifically, this statement was not an indication of the ALJ's failure to consider Plaintiff's combined impairments, but simply a reason to doubt the supportability and accuracy of Dr. Gollamudi's conclusion.  The ALJ made this statement in the midst of rejecting Dr. Gollamudi's treating physician opinion.  (*See* R. at 29–32.)  In this portion of the opinion, the ALJ also recognized that in weighing the medical source opinions he must consider factors such as the treatment relationship, supportability, and specialization.  (R. at 29); *see also* 20 C.F.R. 416.927(d).  Dr. Gollamudi was Plaintiff's treating psychiatrist, and his treatment notes provide no indication that he was significantly involved in Plaintiff's physical treatment.  (*See* R. at 610–40.)  Accordingly, to the extent Dr. Gollamudi's opinion was assessing Plaintiff's physical impairments, the ALJ was justified in finding his opinion to be unsupported and outside his specialty.[16]

Furthermore, read as a whole, it is evident that the ALJ's decision considers the combined effects of Plaintiff's impairments.  The ALJ began his decision by performing a thorough review of both Plaintiff's physical and mental impairments, including the findings and opinions of the various medical sources.  (R. at 20–32.)  The ALJ then found that Plaintiff had

---

[15]  Plaintiff is correct that certain pieces of evidence within Plaintiff's extensive record suggest that the interplay between Plaintiff's physical and mental impairments made these impairments worse.  Nevertheless, due to the widely diverging opinions and evidence in this case, it was not unreasonable for the ALJ to find that his RFC accommodated the combination of Plaintiff's impairments.

[16]  Even assuming that this reason did not justify the ALJ in rejecting Dr. Gollamudi's opinion, there are a variety of other reasons supporting the ALJ's rejection, as the undersigned has outlined above.

severe impairments that were both mental and physical.  (R. at 32–33.)  In his assigned RFC, the

ALJ included both exertional and non-exertional limitations.  (R. at 34.)  Specifically, the ALJ

limited Plaintiff to light work, with various other physical limitations, and incorporated the

medical expert conclusions with regard to Plaintiff's mental restrictions.  (*Id.*)  In posing a

hypothetical question to the vocational expert at the administrative hearing, the ALJ included

both Plaintiff's mental and physical limitations.  (R. at 860–62.)  Finally, the decision is devoid

of any indication that the ALJ separated Plaintiff's impairments and considered, impairment by

impairment, whether each individually rose to the level of a disability.  Under these

circumstances, the undersigned finds that the ALJ adequately considered the combined effects of

Plaintiff's impairments.

## VII.  <u>Conclusion</u>

For the foregoing reasons,  it is **RECOMMENDED** that the Court **AFFIRM** the

Commissioner's decision in this case.

## VIII.  <u>Notice</u>

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

February 2, 2010 _____ /s/ *Elizabeth A. Preston Deavers* _____
                                    Elizabeth A. Preston Deavers
                                    United States Magistrate Judge

31